**UNITED STATES DISTRICT COURT**　　　**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 4:13-CR-181 (2) |
| | § | |
| JAIME SILVA CAVAZOS | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Jaime Silva Cavazos's ("Silva Cavazos") *pro se* Motion for Compassionate Release (#145), wherein he asks the court to reduce his sentence and release him from imprisonment, resulting in his transfer to the custody of United States Immigration and Customs Enforcement ("ICE") where he will await deportation, or place him in home confinement for the remainder of his term of incarceration. The Government filed a response in opposition (#90). United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.　　Background

On July 10, 2013, a federal grand jury in the Eastern District of Texas returned a single-count Indictment charging Silva Cavazos and two codefendants with Conspiracy to Possess with the Intent to Manufacture and Distribute Methamphetamine, in violation of 21 U.S.C. § 846. On December 17, 2013, Silva Cavazos pleaded guilty to Count 1 of the Indictment, pursuant to a plea agreement. Subsequently, on April 8, 2015, the court sentenced Silva Cavazos to 135 months' imprisonment, to be followed by a five-year term of supervised release. Silva Cavazos is currently housed at Giles W. Dalby Correctional Institution ("CI Giles W. Dalby"), located in Post, Texas.

His projected release date is January 19, 2023.  Silva Cavazos is a citizen of Mexico and is subject to an ICE detainer upon his release from prison.

II.   <u>Analysis</u>

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> (A) the court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

A.   <u>Exhaustion of Administrative Remedies</u>

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release.  *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior

to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, 141 S. Ct. 920 (2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP).  The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf.  *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019).  The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement.  18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15 F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").  Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F. 4th at 338 ("[A]n inmate has two routes by which he may

exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion

on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)); *United States v. Harris*, 812 F.

App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir.

2020) (defendant "was required to request that the BOP file a compassionate-release motion on

his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d

at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14,

2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse

[defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting

period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La.

Apr. 9, 2020))).

Here, Probation reports that Silva Cavazos submitted a request for compassionate release

to the warden of his facility on September 7, 2020.  On September 25, 2020, Warden Friend

denied Silva Cavazos's request due to "failing to provide a release plan and having a detainer with

[ICE]."  Although Silva Cavazos complied with the exhaustion requirement before filing the

instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to

modify his term of imprisonment.

B.   Criteria for Release

The United States Court of Appeals for the Fifth Circuit has held that when a defendant

moves for compassionate release, he must establish three criteria.  *United States v. Shkambi*, 993

F.3d 388, 392 (5th Cir. 2021).  First, he must meet one of two conditions listed in

§ 3582(c)(1)(A)—either the defendant has extraordinary and compelling reasons that warrant a

reduction under 18 U.S.C. § 3582(c)(1)(A)(i) or the defendant is at least 70 years of age, has

served at least 30 years in prison, and meets the additional requirements of 18 U.S.C. § 3582(c)(1)(A)(ii).  *Id.* at 391.  Second, the defendant "must show that compassionate release is consistent with the applicable policy statements from the [United States Sentencing Commission ("Commission")]."  *Id.* at 392.  Third, the defendant "must convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors."[1]  *Id.*; *accord United States v. Keys*, 846 F. App'x 275, 276 (5th Cir. 2021); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

Section 3582(c)(1)(A)(i) does not define the "extraordinary and compelling reasons" that may merit compassionate release.  Rather, Congress elected to delegate its authority to the Commission.  *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *Cooper*, 996 F.3d at 287; *Shkambi*, 993 F.3d at 392.  Prior to the passage of the First Step Act, the Commission issued a policy statement set forth in U.S.S.G. § 1B1.13, which, along with its commentary, describes what reasons qualify as

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guideline ("U.S.S.G.") provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

extraordinary and compelling.[2]  However, § 1B1.13 references only motions filed by "the Director of the [BOP]"—not an individual defendant.[3]  Consequently, the Fifth Circuit has held that when a defendant files a motion for compassionate release on his own behalf, the Commission's policy statement set forth in § 1B1.13 is not applicable because that policy statement governs only motions filed by the Director of the BOP.  *See Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Nevertheless, while recognizing that they are not binding, the court views the Commission's policy statement contained in § 1B1.13 and the commentary thereto as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release.  *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (upholding denial of compassionate release and recognizing that the court was guided in its analysis by the commentary to U.S.S.G. § 1B1.13).  A review of dictionary definitions also sheds light on the meaning of these terms.  The word "extraordinary" is defined as "going beyond what

---

[2] In Application Note 1 to § 1B1.13 of the U.S.S.G., the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  U.S.S.G. § 1B1.13 cmt. n.1.

[3] U.S.S.G. § 1B1.13 was last amended on November 1, 2018.  The Commission has, to date, been unable to amend § 1B1.13 to incorporate the changes wrought by the First Step Act due to the lack of a quorum.  The Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a), 994(a).  At present, the Commission has only one voting member.

is usual, regular, or customary . . . exceptional to a very marked extent," whereas the word "compelling" is defined as "forceful . . . demanding attention . . . convincing." *Extraordinary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *Compelling*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see United States v. Mitchell*, No. 15-20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021). "Courts have interpreted 'extraordinary' in the context of compassionate release as 'beyond what is usual, customary, regular, or common,' and a 'compelling reason' as 'one so great that irreparable harm or injustice would result if the relief is not granted.'" *Mitchell*, 2021 WL 1827202, at *2 (quoting *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020); *United States v. Sapp*, No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020)).

      1.    <u>Medical Condition</u>

In the instant motion, Silva Cavazos, age 48, contends that he is eligible for compassionate release due to his medical condition. Specifically, he claims that he suffers from Type 2 diabetes and hypertension and argues that those conditions constitute extraordinary and compelling circumstances warranting his release from prison.

Although not binding on the court, § 1B1.13 suggests that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected

to recover." U.S.S.G. § 1B1.13 cmt. n.1(A). Here, according to Silva Cavazos's Presentence Investigation Report ("PSR"), prepared on February 19, 2014, he did not report a history of experiencing serious medical problems. The only medical issue he mentioned was a strained muscle in his right shoulder for which he was prescribed Advil.

Silva Cavazos's medical records reveal that he now suffers from Type 2 diabetes mellitus "without complications." His diabetes is considered mild. Indeed, Silva Cavazos takes metformin to treat his diabetes but is not insulin dependent. His most recent A1c levels—6.1 on March 18, 2021, 6.4 on January 15, 2021, and 6.8 on December 10, 2020—further confirm his diagnosis.[4] Notably, on November 11, 2021, Jacob Reddick, M.D. ("Dr. Reddick"), noted that Silva Cavazos's most recent A1c level was "good" at 6.1. Silva Cavazos has also been diagnosed with hypertension. His most recent blood pressure readings were 140/92 on December 28, 2021, 135/83 on December 16, 2021, and 119/77 on November 1, 2021.[5] He is prescribed lisinopril and aspirin to control his hypertension.

Probation reports that Silva Cavazos is classified as a BOP Medical Care Level 1 inmate. According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 1 inmates "are less than 70 years of age and are generally healthy. They may have limited medical needs that can be easily managed by clinician evaluations every 6-12 months."

---

[4] A hemoglobin A1c test is a method for measuring blood sugar. According to the Centers for Disease Control and Prevention ("CDC"), a normal A1c level is below 5.7%, a level of 5.7% to 6.4% indicates prediabetes, and a level of 6.5% or more denotes diabetes.

[5] According to the CDC, a "Normal" systolic level is less than 120 mm Hg with a diastolic of less than 80 mm Hg; the "At Risk" systolic range is 120 to 139 mm Hg with a diastolic range of 80 to 89 mm Hg; and a "High Blood Pressure" systolic level is 140 mm Hg or higher with a diastolic of 90 mm Hg or higher.

None of Silva Cavazos's medical conditions are terminal or substantially diminish his ability to provide self-care, nor do they otherwise present extraordinary and compelling reasons justifying compassionate release.  *See Thompson*, 984 F.3d at 433.  To the contrary, Silva Cavazos's infirmities appear to be well managed with medication and monitoring.  *See id.*  On December 28, 2021, Dr. Reddick examined Silva Cavazos and noted that the degree of control for his diabetes was good and that the clinical status of his diabetes was stable.  Dr. Reddick further observed that the degree of control for his hypertension was fair and that the clinical status of his hypertension was stable.  Consequently, Dr. Reddick continued Silva Cavazos's medication for diabetes, metformin, at the current dose, but he increased the dosage of Silva Cavazos's medication for hypertension, lisinopril.  The court acknowledges that, according to the CDC website, two of Silva Cavazos's underlying medical conditions—Type 2 diabetes and hypertension—can make him more likely to become severely ill should he contract COVID-19.[6] Nonetheless, such commonplace afflictions do not make Silva Cavazos's case "extraordinary." *See id*. at 434.

According to the CDC, 34.2 million people in the United States, approximately 10.5% of the population, have diabetes.  Of those, 90 to 95% have Type 2 diabetes.  The CDC further reports that 45% of the adults in the United States (108 million) have hypertension, and of those, only about 24% have their condition under control.  Due to their prevalence, diabetes and hypertension cannot be deemed "extraordinary" in order to merit compassionate release.  *See Thompson*, 984 F.3d at 434 (noting that neither hypertension nor high cholesterol made the

---

[6] In relevant part, the CDC states that adults who have diabetes (Type 1 or Type 2) or heart conditions (such as hypertension) can be more likely to become severely ill from COVID-19.

defendant's case "extraordinary" because "nearly half of the adult population in the United States suffers from hypertension" and "roughly 12% of Americans suffer from high cholesterol"); *United States v. Hodgin*, No. 4:15-CR-40110-02-KES, 2021 WL 928179, at *3 (D. S.D. Mar. 11, 2021) (denying compassionate release to inmate who suffers from Type 2 diabetes, hypertension, hyperlipidemia, kidney disease, arthritis, and several other medical conditions); *United States v. Williams*, No. CR 15-83-SDD-EWD, 2021 WL 414825, at *3 (M.D. La. Feb. 5, 2021) (denying compassionate release to inmate with Type 2 diabetes and obesity because there was no evidence these conditions had diminished his ability to provide self-care within the facility); *United States v. Cotto*, No. CV 16-36, 2020 WL 5761192, at *2 (E.D. La. Sept. 28, 2020) (recognizing the seriousness of diabetes and obesity but denying compassionate release because inmate had not shown that he was unable to take care of himself within the confines of the facility or that the BOP could not manage his medical conditions appropriately in view of medical records showing that he was being administered the necessary care); *United States v. Dressen*, No. 4:17-CR-40047-01-KES, 2020 WL 5642313, at *3 (D.S.D. Sept. 22, 2020) (denying compassionate release because the defendant did not identify "how his Type 2 diabetes prevents him from providing self-care in a correctional facility setting or how it amounts to extraordinary and compelling circumstances"); *United States v. Durham*, No. 3:18-cr-251-MOC-DCK-1, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (finding the fact that the defendant has hypertension, a condition that may increase his risk for severe illness from COVID-19, without more, does not present an "extraordinary and compelling reason" for compassionate release); *United States v. Wilson*, No. 2:18cr132, 2020 WL 4901714, at *5 (W.D. Wash. Aug. 20, 2020) (rejecting the notion that inmate's hypertension claim was sufficient to justify early termination

10

of sentence); *United States v. Jeffers*, 466 F. Supp. 3d 999, 1007 (N.D. Iowa 2020) (finding that the defendant had not demonstrated extraordinary and compelling circumstances when his diabetes and hypertension were controlled, monitored, and managed by the BOP).

In this instance, Silva Cavazos appears to be able to provide self-care in the institutional setting and is not limited in his activities of daily living. Thus, he has failed to establish the existence of medical problems that would constitute extraordinary and compelling reasons to reduce his sentence.

### 2. Other Reasons

Silva Cavazos also seeks compassionate release due to his post-sentence rehabilitation and the presence of COVID-19 in prison.

#### a. Rehabilitation

Silva Cavazos maintains that his post-sentence rehabilitation, evidenced by the courses he has taken and the programs he has completed, establishes extraordinary and compelling reasons for compassionate release. While the court may consider rehabilitation efforts, "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t); *see Shkambi*, 993 F.3d at 392; *United States v. Brooker*, 976 F.3d 228, 237-38 (2d Cir. 2020) (holding that a district court's discretion in sentencing is broad; however, there is a "statutory limit on what a court may consider to be extraordinary and compelling . . . [and] '[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason.'" (quoting 28 U.S.C. § 994(t))); *United States v. Hudec,* No. CR 4:91-1-1, 2020 WL 4925675, at *5 (S.D. Tex. Aug. 19, 2020) ("While the Court is permitted to consider post-sentencing rehabilitation in determining whether to grant an eligible defendant a sentence reduction, it is not

authorized to grant a reduction based upon post-sentencing rehabilitation alone."); *cf. United States v. Whitehead*, 986 F.3d 547, 551 (5th Cir. 2021) (upholding the denial of a sentence reduction from a life sentence and finding that the court may, but is not required, to consider a defendant's post-conviction rehabilitative efforts when evaluating a motion for reduction under § 404 of the First Step Act). In fact, "[m]aking good use of one's time in prison is not uncommon, and indeed is expected." *United States v. Blanco*, No. 16-CR-408 (CS), 2021 WL 706981, at *2 (S.D.N.Y. Feb. 22, 2021) (quoting *United States v. Alvarez*, No. 89-CR-229, 2020 WL 4904586, at *7 (E.D.N.Y. Aug. 20, 2020)). Nevertheless, on March 7, 2018, Silva Cavazos received a disciplinary infraction at CI Giles W. Dalby for being in an unauthorized area.

While Silva Cavazos claims that he will be deported to Mexico upon his release from custody, ensuring that he will not pose a risk to society, the Seventh Circuit has found a similar argument not to be extraordinary and compelling. *See United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) (rejecting compassionate release of a [Nigerian] prisoner reasoning that his removal to Nigeria "was known from the outset and played a role in setting the original sentence"). Moreover, in light of Silva Cavazos's offense of conviction, involving his participation in a drug-trafficking conspiracy and his role as a supplier of methamphetamine, the court finds that "[s]ending [the defendant] overseas will not guarantee the safety of people in this nation or any other." *Id.*

Thus, although Silva Cavazos indicates that he has participated in educational opportunities and has received certificates of completion in two of the courses, he has not presented sufficiently extraordinary and compelling accomplishments or circumstances to merit compassionate release under the facts of this case. *See United States v. Lewis*, No. 17-CR-28-FPG, 2021 WL 4519795,

at *3 (W.D.N.Y. Oct. 4, 2021) (finding defendant's efforts at rehabilitation and plans to start a new life elsewhere to be commendable and recognizing the unusual burdens he faced in prison but finding those considerations not to undermine the factors that led to his original sentence—his offense, his criminal history, and the need for deterrence); *United States v. Boyd*, No. 3:17-CR-37-TAV-DCP-4, 2021 WL 5094903, at *4 (E.D. Tenn. Nov. 2, 2021) (the court, while recognizing defendant's efforts to improve himself, did not find his rehabilitation efforts to be so extraordinary as to outweigh the other sentencing factors); *United States v. Willsey*, No. 3:00-cr-00438-HZ, 2021 WL 4462889, at *2 (D. Ore. Sept. 28, 2021) (although finding defendant's steps toward rehabilitation to be laudable, the court ruled that they did not present an extraordinary circumstance that would justify compassionate release, particularly given the seriousness of his offenses of conviction); *United States v. Rounds*, No. 10-CR-239S (2), 2021 WL 4437170, at *4 (W.D.N.Y. Sept. 28, 2021) (commenting that defendant's efforts at rehabilitating himself were laudable and should be continued, but concluding that they did not alone or in combination with his other arguments constitute an extraordinary and compelling reason for compassionate release). Similarly, the court hopes that Silva Cavazos will continue on the path to rehabilitation, but declines to exercise its discretionary authority under § 3582 at this time based on his rehabilitation efforts. *See Lewis*, 2021 WL 4519795, at *3.

b.    COVID-19

Silva Cavazos expresses concerns regarding the spread of COVID-19 among the prison population. Nevertheless, as of March 30, 2022, the figures available at www.bop.gov list 0 inmates (out of a total inmate population of 1,447) at CI Giles W. Dalby as having confirmed positive cases of COVID-19 and 120 inmates who have recovered. Thus, it appears that the

facility where Silva Cavazos is housed is handling the outbreak appropriately and providing adequate medical care.

Although Silva Cavazos expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Silva Cavazos, if he were to contract the virus and develop COVID-19 symptoms, while incarcerated.  *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification").  Furthermore, contracting the virus while incarcerated, even

14

in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Moreover, the BOP is in the process of administering the COVID-19 vaccine to inmates and staff. To date, the BOP has administered approximately 308,600 doses of the vaccine. Indeed, according to Silva Cavazos's BOP medical records, he received the Johnson & Johnson vaccine on April 8, 2021. In the Fifth Circuit and elsewhere, courts have denied early release to inmates with a variety of medical conditions who have been vaccinated for COVID-19. *See United States v. Walker*, No. 20-cr-20027, 2021 WL 2474088, at *3 (C.D. Ill. June 17, 2021) (holding that because defendant was fully vaccinated, his underlying health conditions—diabetes, heart disease, high blood pressure, asthma, and substance abuse—alone, were insufficient to establish extraordinary and compelling reasons justifying compassionate release); *United States v. Parham*, No. 1:19-CR-133-LG-RHW-1, 2021 WL 1911899, at *2 (S.D. Miss. May 12, 2021) (finding that "generalized concerns of contracting COVID-19[] are not an 'extraordinary and compelling reason'" where the defendant had received the COVID-19 vaccine); *United States v. Meyer*, No 1:14-cr-00148-01-MC, 2021 WL 1895240, at *1-2 (D. Ore. May 11, 2021) (denying compassionate release to inmate with heart disease, obesity, hyperlipidemia, and a history of smoking because he was fully vaccinated and there was a low infection rate at the facility where he was housed); *United States v. Schad*, No. CR 2:17-225-3, 2021 WL 1845548, at *4 (S.D. Tex. May 5, 2021) (denying compassionate release where the defendant had been fully vaccinated

against COVID-19); *United States v. Grummer*, No. 08-CR-4402-DMS, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release and noting that "[a]lthough Defendant suffers from several chronic medical conditions, his vaccination significantly mitigates the risk that he will contract COVID-19"); *United States v. Beltran*, No. 6:16-CR-00004, 2021 WL 398491, at *3 (S.D. Tex. Feb. 1, 2021) (denying compassionate release to a high-risk inmate with myriad underlying medical conditions who received the vaccine, finding that "vaccination significantly reduces [the] risk of contracting COVID-19 or experiencing complications related to a COVID-19 infection"); *accord United States v. Nunez-Arias*, No. CR H-16-436, 2021 WL 1537323, at *3 (S.D. Tex. Apr. 19, 2021).

Furthermore, it is well settled that "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  In exercising its discretion, the court finds that Silva Cavazos has failed to establish that his medical condition or other reasons constitute extraordinary and compelling reasons to reduce his sentence and release him from imprisonment.

3.   Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a).  *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *Keys*, 846 F. App'x at 276; *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94.  Silva Cavazos's offense of conviction entails his participation in a drug trafficking

16

organization in which he supplied kilogram quantities of methamphetamine to other conspirators for further distribution in Texas.

The Drug Enforcement Administration and the Sherman, Texas, Police Department began a joint investigation of the drug trafficking activities of Raul Cruz Aguilar ("Aguilar")—Silva Cavazos's codefendant.  Aguilar agreed to sell 10 pounds of methamphetamine to an undercover officer ("UC") for $130,000.  Aguilar agreed to meet the UC on June 19, 2013, in Plano, Texas, to conduct the drug transaction.  Aguilar told the UC he would deliver the methamphetamine in two 5-pound increments.  While under surveillance, Aguilar arrived at the meeting location on June 19, 2013.  Another vehicle occupied by Silva Cavazos also arrived at the scene and parked at a nearby furniture store.  Aguilar exited his vehicle and entered another vehicle occupied by the UC and a confidential source ("CS").  Aguilar and the CS then got into Aguilar's vehicle and traveled to the furniture store where Silva Cavazos had parked.  Silva Cavazos exited the furniture store, got into his vehicle, and parked next to Aguilar's vehicle.  Aguilar and the CS then approached Silva Cavazos's vehicle, where Aguilar showed the CS approximately 5 pounds of methamphetamine.  Aguilar and the CS returned to Aguilar's vehicle and drove back to the UC's vehicle. When the CS told the UC that the CS had observed the methamphetamine, both Aguilar and Silva Cavazos were arrested.

Approximately 5 pounds of methamphetamine were seized during a search of Silva Cavazos's vehicle.  Silva Cavazos also admitted to being an alien illegally present in the United States and to possessing a false Social Security card, which had been seized from his wallet at the time of his arrest.  Silva Cavazos stipulated that he was responsible for 15 kilograms or more of a mixture or substance containing a detectable amount of methamphetamine or 1.5 kilograms or

more of methamphetamine (actual).  He also stipulated that his role in the conspiracy was to supply coconspirators with kilogram quantities of methamphetamine from various sources, which would then be distributed to other coconspirators and codefendants during the conspiracy.

Silva Cavazos was arrested on a prior occasion for another drug-related offense. Specifically, Silva Cavazos was arrested for possession of a controlled substance (cocaine) on November 27, 2011, in Dallas, Texas.  Additionally, he has a history of substance abuse, beginning at age 18, including the use of marijuana and alcohol.  While in prison, he violated institutional rules by being in an unauthorized area.

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  Where, as here, a prisoner has engaged in "severe" criminal conduct, the district court has discretion to deny compassionate release under the circumstances.  *Id.* at 693-94; *accord Keys*, 846 F. App'x at 276 (rejecting Defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal").  In view of the nature and circumstances of his offense of conviction, his history of drug abuse, and his BOP disciplinary record, the court cannot conclude that Silva Cavazos's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole.

In addition, granting Silva Cavazos compassionate release would fail to provide just punishment for his offense and promote respect for the law.  In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient

18

portion of his sentence.  948 F.3d at 694.  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94.  "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'"  *Chambliss*, 948 F.3d at 693-94; *see Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns").  In the instant case, releasing Silva Cavazos after he has served only 9 years (or approximately 78%) of his 11-year sentence would similarly minimize the impact of his crime and the seriousness of his offense as well as fall short of providing just punishment and adequate deterrence to criminal conduct.

C.      Home Confinement

Silva Cavazos maintains that the court should place him in home confinement due to the risk of contracting COVID-19 in prison.  Silva Cavazos misapprehends the application and construction of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  The CARES Act "expanded the [BOP]'s power to 'place a prisoner in home confinement' under § 3624(c)(2) . . . but reserved the determination of 'suitable candidates' for home confinement to the [BOP]."  *United States v. Williams*, 829 F. App'x 138, 139 (7th Cir. 2020) (quoting *Alam*, 960 F.3d at 836)).  The CARES Act states in relevant part:

19

> HOME CONFINEMENT AUTHORITY.—During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate.

Coronavirus Aid, Relief, And Economic Security Act, Pub. L. No. 116-136, 134, § 12003 Stat. 281, 516 (2020).   The CARES Act does not grant the court the authority to make home confinement determinations.   "Nor for that matter is any such role envisioned under § 3624(c)(2), which authorizes the [BOP] 'to the extent practicable, [to] place prisoners with lower risk levels and lower needs on home confinement . . . .'   As the Supreme Court emphasizes, the [BOP] has 'plenary control' over an inmate's placement."   *Williams*, 829 F. App'x at 139 (quoting *Tapia v. United States*, 564 U.S. 319, 331 (2011)).

Hence, the BOP has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement.   18 U.S.C. § 3621(b); *Cheek v. Warden of Fed. Med. Ctr.*, 835 F. App'x 737, 739 (5th Cir. 2020) (holding that "the pandemic did not create judicial authority to grant home confinement"); *United States v. Donnell*, 476 F. Supp. 3d 514, 522 (E.D. Tex. 2020); *Ambriz v. United States*, 465 F. Supp. 3d 630, 633 (N.D. Tex. 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement.").   Further, the BOP's decision regarding home confinement is not subject to judicial review.   *See* 18 U.S.C. § 3621(b); *United States v. Powell*, No. CR 15-496-4, 2020 WL 2848190, at *2 n.5 (E.D. Pa. June 2, 2020) ("[T]o the extent that [Defendant] seeks to appeal the prison's denial of home confinement, such decision is not reviewable by this Court.").   Indeed, it is well established that "[n]o inmate has a constitutional right to be housed in a particular place

or any constitutional right to early release." *Cheek*, 835 F. App'x at 740.  As a consequence, "[i]t is not for a court to step in and mandate home confinement for prisoners, regardless of an international pandemic." *Id*.

Furthermore, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19.  In response to a directive from the former United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the CDC, for the purpose of determining which inmates are suitable for placement on home confinement.  *See United States v. Collins*, No. CR 04-50170-04, 2020 WL 1929844, at *3 (W.D. La. Apr. 20, 2020).  The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. Since March 26, 2020, the BOP has placed 39,990 inmates on home confinement.  The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates.  He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways."  The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes

that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

Notably, with respect to the instant motion, Probation advises the court that Silva Cavazos does not have a viable release plan.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Silva Cavazos's track record is similarly a poor one. There is no reason to believe that Silva Cavazos would not revert to his prior drug-dealing and drug-abusing behavior if released from prison at this time.

III. Conclusion

In sum, Silva Cavazos has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he

Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

For these reasons, Silva Cavazos's *pro se* Motion for Compassionate Release (#145) is DENIED.

SIGNED at Beaumont, Texas, this 30th day of March, 2022.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE